# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PSN ILLINOIS, LLC )
)
    Plaintiff, )
)
    v. )
)   No. 07 C 7190
ABCAM, INC., ABGENT, INC., )
AFFINITY BIOREAGENTS, INC. )   Judge Hibbler
DISCOVERX CORPORATION, )
EXALPHA BIOLOGICALS, INC., )   Magistrate Judge Valdez
GENETEX, INC. LIFESPAN )
BIOSCIENCES, INC. MULTISPAN, INC. )
and NOVUS BIOLOGICALS, INC., )
)
    Defendants. )
)
)

## DECLARATION OF SUZANNE M. MANDALA

I, Suzanne M. Mandala, willfully declare as follows:

1.    I am Director of Immunology at Merck & Co., Inc. ("Merck"). I have held this position at Merck since 2002, and have otherwise been employed by Merck since 1989.

2.    Merck is a pharmaceutical company in the business of manufacturing and marketing for commercial sale medicines and vaccines.

3.    While at Merck, I have conducted research in the field of immunology, with the goal of developing immunological medicines for commercial sale.

4.    I have personal knowledge of S1P receptor research and development work conducted at Merck, including S1P receptor research and development work referenced by the publications and patents identified below:

    a.    I am lead author, or co-author, of numerous publications concerning S1P receptor research, including all 12 publications identified as "Merck publications" in the June 16, 2006 letter to Merck from A. John MacLennan and Jeff Lloyd. To the extent those publications reflect S1P receptor research and development work conducted at Merck, I have personal knowledge of such work.

    b.    I, along with Jeff Hale (among others), am listed as an inventor of PCT patent application no. WO 03/061567 A2. To the extent the disclosure of PCT patent

application no. WO 03/061567 A2 reflects S1P receptor research and development work conducted at Merck, I have personal knowledge of such work.

c.    Dr. Hale is also listed as an inventor of PCT patent application nos. WO 2005/032465 A2, WO 2005/058848 A1, and WO 2006/047195 A2. I am familiar with subject matter disclosed by those patent applications to Hale *et al.*, and to the extent those disclosures reflect S1P receptor research and development work conducted at Merck, I have personal knowledge of such work.

5.    To the best of my knowledge, Merck has not achieved any level of commercial success through the use of S1P2 receptors. In particular, Merck has commercialized no products developed through the use of S1P2 receptors.

I declare under penalty of perjury that all statements made herein are true.

Executed on May 15, 2008

Suzanne M. Mandala

2

# Exhibit 2

05-08 Hearing Transcript.txt

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   PSN ILLINOIS, LLC, an Illinois  )  Docket No. 07 C 7190
     corporation,                    )
 4                                    )
                         Plaintiff,  )
 5                                    )
          v.                         )  Chicago, Illinois
 6                                    )  May 8, 2008
     ABCAM, INC., et al.,            )  9:30 o'clock a.m.
 7                                    )
                        Defendants.  )
 8
              TRANSCRIPT OF PROCEEDINGS - STATUS, MOTION
 9            BEFORE THE HONORABLE WILLIAM J. HIBBLER

10   APPEARANCES:

11   For the Plaintiff:        MICHAEL P. MAZZA, LLC, by
                               MR. MICHAEL P. MAZZA
12                             MS. DANA LAUREN DREXLER
                               686 Crescent Boulevard
13                             Glen Ellyn, Illinois 60137

14   For Defendant LifeSpan:   TREXLER, BUSHNELL, GIANGIORI &
                               BLACKSTONE, LTD., by
15                             MR. TIMOTHY M. MCCARTHY
                               105 West Adams Street
16                             36th Floor
                               Chicago, Illinois 60603
17
     For Merck:                JENNER & BLOCK, by
18                             MR. JONATHAN HILL
                               330 North Wabash
19                             Chicago, Illinois 60611

20

21

22              ALEXANDRA ROTH, CSR, RPR
                  Official Court Reporter
23              219 South Dearborn Street
                       Room 1224
24              Chicago, Illinois 60604
                     (312) 294-0134
25
```

2

```
 1   (Proceedings had in open court:)

 2        THE CLERK:  07 C 7190, PSN Illinois, LLC., versus
```

3   Abcam, Inc., et al.   Status and motions.

4          MR. MAZZA:  Good morning, your Honor.  Mike Mazza,

5   Dana Drexler on behalf of PSN.

6          MR. MCCARTHY:  Timothy McCarthy for the defendant

7   LifeSpan.

8          MR. HILL:  Good morning, your Honor.  Jonathan Hill

9   appearing on behalf of Merck.

10          THE COURT:  Okay.  Let's see.  And I may not take

11   these in order, but one of the first things I want to deal with

12   is the matter regarding Multispan, which I had on the last date

13   entered and continued a motion for default.  And ultimately I

14   received a second filing which was an agreed judgment.

15          MR. MAZZA:  Yes, your Honor.  I'm thankful to say we

16   were able to settle that case.  So we've withdrawn the motion

17   for default, and the parties have agreed to settle it per the

18   consent judgment order you have.

19          THE COURT:  Okay.  Do we have -- because I see that I

20   still have a copy of the unsigned consent judgment order.  Did

21   that get filed, Jackie?

22          THE CLERK:  Do you know which document number that is?

23          THE COURT:  No, ma'am.

24     (Brief pause.)

25          MR. MAZZA:  Your Honor, we will be happy to provide a

                                                            3


1   signed copy.  If we didn't do it through inadvertence, I

2   apologize.

3          THE COURT:  I have a copy I can sign.  I am just not

4   sure whether or not I ever did it.  And I want to make sure we

5   don't have --

6          MR. MAZZA:  I see.

7          THE COURT:  -- the record absent a signed copy of your
                              Page 2

05-08 Hearing Transcript.txt

 8    agreement.

 9            Why don't I do this.  I will give you this one,

10    Jackie.  I don't know if the record shows a prior date.  Date

11    it the day that's shown on the record.  If it's not dated, we

12    will date it today.

13            THE CLERK:  We will date it today.

14            THE COURT:  All right.  Now, the parties who are here,

15    I have a motion by the LifeSpan defendants to dismiss based

16    upon jurisdiction and venue.

17            MR. McCARTHY:  Yes, your Honor.  That's my motion.

18    And the plaintiff has served me some discovery relevant to that

19    that I got last week that I intend to answer.  So my suggestion

20    is if we have another status on that say like the second week

21    in June, and I'll have the discovery done on that by then, and

22    then we can figure out what kind of briefing schedule to enter.

23            THE COURT:  Any problem with that?

24            MR. MAZZA:  No, your Honor, no problem.

25            THE COURT:  So that motion, filing of that motion,

                                                              4


 1    will be allowed.  And we will hold in abeyance setting a

 2    briefing schedule until we next meet.

 3            MR. McCARTHY:  All right.

 4            THE COURT:  And I also have a plaintiff's motion

 5    seeking to compel discovery from the Merck company?

 6            MR. MAZZA:  Yes, your Honor.  Merck is a drug company

 7    that has published some studies that indicate that it's using

 8    the technology in question.  We are not sure to what extent

 9    their commercial -- they commercialized the patented

10    technology.  And so we've asked Merck to tell us that because

11    we believe that would be relevant to the LifeSpan case because

                                Page 3

05-08 Hearing Transcript.txt

12    LifeSpan used Merck as a subscriber.

13           LifeSpan had a database of this information, and Merck

14    was a subscriber to it.  And we are not sure, but it appears

15    that Merck would have had access to the patented technology

16    through LifeSpan.  And published studies indicate that it's

17    using it.

18           So anyway, we went to Merck and asked them to tell us

19    the extent of what they've done.  And unfortunately we haven't

20    been able to come to resolution on that.  We have served them

21    with a document subpoena and the deposition subpoena.  But

22    we've been unable to get any information from them.

23           MR. HILL:  You Honor, there are two categories of

24    information at issue here.  The first category concerns

25    documents, letters, communications between LifeSpan and Merck,

                                                            5


1     which should be readily available from LifeSpan.  We've --

2     discovery opened on May 1.  We've asked PSN to approach

3     LifeSpan to see what documents can be produced.  If for some

4     reason LifeSpan cannot produce any of these documents, then we,

5     Merck, will conduct a reasonable search for those documents.

6     But I think it's unfair to Merck as a nonparty to this case

7     with such discovery demands at this juncture.

8            There is a second category of documents that LifeSpan

9     obviously does not have, and that concerns Merck's confidential

10    research activities.  Your Honor, it's important to bear in

11    mind that this is a case against LifeSpan, not Merck.  They've

12    argued that commercial success on -- or that Merck's activities

13    are somehow germane to a reasonable royalty that LifeSpan would

14    pay as a result of a hypothetical negotiation conducted

15    pursuant to the specific factors.

16           The fact is, LifeSpan charges a flat fee for state of

                                    Page 4

05-08 Hearing Transcript.txt

17    its access.  It derives no benefit, no additional benefit,

18    whatsoever from whatever a third -- a nonparty like Merck or

19    any other subscriber may do with the information that it

20    obtains.  There is no possible pecuniary benefit to LifeSpan

21    that in any way depends on what Merck may or may not do at its

22    downstream use of that information.

23         So we think that whatever information Merck may have

24    is totally irrelevant to the issue of the reasonable royalty

25    that LifeSpan would pay.

                                                                6


1         And perhaps more fundamental point, your Honor, this

2    whole discovery is predicated on commercial success.  They have

3    not even alleged that Merck has commercialized what they

4    believe to be patented technology, much less had commercial

5    success in so doing.

6         And, you know, at bottom, your Honor, we feel that

7    this is a fishing expedition to look at Merck's confidential

8    research information and an attempt to concoct some sort of

9    patent infringement case against Merck, which of course is

10   improper.

11        Your Honor, if -- if you're still inclined to

12   entertain the motion to compel, we would request a week to get

13   a brief on file.

14        MR. MAZZA:  Thank you, your Honor.  To deal with the

15   first point in terms of the unfair burden on Merck, we did --

16   we have talked, of course, with LifeSpan.  And I'm sure

17   LifeSpan's attorney here can confirm, they do not have the

18   information that we are looking for from Merck.  LifeSpan

19   didn't keep tabs on what kind of commercial activity Merck has

20   engaged in with regard to this technology.  They just don't

                                Page 5

05-08 Hearing Transcript.txt

21  know.  They don't have documents.  Only Merck knows that

22  information.  Only Merck has those documents.

23        With regard to the arguments made regarding the

24  relevance of this information, I didn't quite follow it.  But

25  essentially our point is really simple.  We need to know to

7

1  what extent Merck has commercialized John MacLennan's S1P2

2  patented technology because it's important to know the extent

3  of the damages in the case.  And commercial success is always a

4  defense to invalidity.

5        So separate and apart from what damages LifeSpan might

6  have -- and we think there is a definite causal link there --

7  in order to rebut LifeSpan or any other defendants' defense of

8  invalidity, we have to be able to show the full extent of

9  commercial success in the patented technology.  And that would

10 include Merck.

11       Now, he is right.  We don't know to what extent Merck

12 has commercialized.  We have a dozen published articles and

13 more than five patents by Merck on this technology that

14 indicates they have.  And I can go so far as to say there is an

15 FTY 720 drug in phase 3 clinical trials that may or may not be

16 commercialized by Merck that deals with MS that we believe uses

17 the patented technology.

18       But only Merck can tell us.

19       MR. HILL:  Your Honor, they --

20       THE COURT:  It does appear to the Court that there

21 is -- let me start with the information that you received from

22 LifeSpan regarding whatever information they have about Merck.

23 Is that in a written form?  Is it orally submitted to you?  How

24 do you have that Merck information?

25       MR. MAZZA:  We've gotten -- it's mostly verbal

Page 6

05-08 Hearing Transcript.txt

8

1    communications.  But there is -- and e-mails from Tim McCarthy

2    to myself.  But we have also received letters.  Essentially

3    what they said is, Merck is one of our subscribers.  Merck paid

4    to us the subscription fee.  Merck accessed the database

5    regarding our technology this many times.  And -- but we don't

6    know what Merck did with it.

7         And we said, well, here is the published studies.

8    Here is the patents.  Do you know anything more?  And LifeSpan

9    said, no, we don't know what they've done.  They haven't kept

10   us abreast of it.

11        MR. HILL:  Your Honor, the bottom line is here,

12   they -- they don't have a good-faith basis to believe that we

13   have commercialization.  They put the cart before the horse

14   when they say they need to know the extent of

15   commercialization.

16        They haven't even alleged that there has been

17   commercialization, period, much less commercial success.  You

18   need some predicate to conduct the discovery.  They don't have

19   that.  They are searching for a needle in a haystack, and there

20   is no needle there.

21        THE COURT:  Well, here is what I will do.  I will give

22   you -- you say a week?  Is that sufficient time for you to

23   respond to this request?

24        MR. HILL:  Yes, your Honor.  That would be more than

25   adequate.

9

1         THE COURT:  I will give you until what day is that?

2         THE CLERK:  The 15th.

Page 7

05-08 Hearing Transcript.txt
3          THE COURT:  The 15th to respond to the motion to

4    compel, the plaintiff's motion to compel.

5          Do you need time to respond to that?  I don't know

6    that there needs to be a response, a reply, but --

7          MR. MAZZA:  Your Honor, if we could have maybe three

8    to five days for reply.  I'm not quite sure that -- the

9    substantive basis of what they might respond.  I'd appreciate

10   that opportunity.

11         THE COURT:  Okay.  Five days to reply.

12         THE CLERK:  That would be the 22nd.

13         MR. MAZZA:  Thank you, your Honor.

14         THE COURT:  Let me just say, in listening to the

15   parties' oral argument, that the Court might suggest that there

16   might be a need, at least as you continue with this process, to

17   attempt to resolve between yourselves this question of really

18   how much commercialization there has been because I think that

19   is a primary question.  And it might be resolved without --

20   because I can see the expense that is going to be associated

21   with this discovery.  And I think it might be in the best

22   interest of both parties to simply sit down, talk about what

23   the issues are, and see if you can arrive at some

24   accommodation.

25         MR. MAZZA:  Okay, your Honor.  We'll certainly try to

                                                            10


1    do that.

2          THE COURT:  Now, what is the situation with regards to

3    the defendant -- I think there is one other defendant left.

4    That's Abgent?

5          MR. MAZZA:  Yes.  Thank you, your Honor.

6          We did get agreement with Abgent's attorney last week.

7    They agreed to either settle the case on the terms we had given
                              Page 8

05-08 Hearing Transcript.txt

8    them through a consent judgment order or to file an answer by

9    May 23rd.  So on the basis of that representation, we agreed to

10   withdraw the motion that we had before you.

11        THE COURT:  Okay.  And someone suggested a mid-June

12   date so that we can perhaps set a briefing schedule as to the

13   pending motion as to LifeSpan.

14        MR. MAZZA:  That would be fine with us, your Honor.

15        THE COURT:  Okay.

16        MR. MCCARTHY:  Yes, mid -- the first week of June I

17   have vacation plans.  So if we can go into the second week of

18   June I will appreciate it.

19        THE CLERK:  June 12.

20        MR. MCCARTHY:  That's fine.

21        THE CLERK:  That's a Thursday, at 9:30.

22        THE COURT:  I am not sure that the Court will be able

23   to resolve this motion to compel on the next date, but I am

24   going to try.

25        MR. MAZZA:  Thank you, your Honor.

                                                        11


1         MR. HILL:  Thank you, your Honor.

2         MS. DREXLER:  Thank you, you Honor.

3         THE COURT:  I understand there was another motion by

4    LifeSpan?

5         MR. MCCARTHY:  Yes, we had an unopposed motion for

6    leave to amend our pleadings.

7         THE COURT:  Okay.  I will grant that motion.  I don't

8    see it, but it's a reasonable motion.  I will allow it.

9         MR. MAZZA:  Thanks very much, your Honor.

10        MS. DREXLER:  Thank you, your Honor.

11        (Which were all the proceedings had at the hearing of the

                              Page 9

```
                    05-08 Hearing Transcript.txt
12          within cause on the day and date hereof.)

13                              CERTIFICATE

14          I HEREBY CERTIFY that the foregoing is a true, correct

15    and complete transcript of the proceedings had at the hearing

16    of the aforementioned cause on the day and date hereof.

17

18    _____        _____
      Official Court Reporter                   Date
19    U.S. District Court
      Northern District of Illinois
20    Eastern Division

21

22

23

24

25
```

# Exhibit 3

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.))**

**H**Builders Ass'n of Greater Chicago v. City of
Chicago
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
BUILDERS ASSOCIATION OF GREATER
CHICAGO Plaintiff,
v.
CITY OF CHICAGO Defendant.
**No. 96 C 1122.**

June 12, 2001.

MEMORANDUM OPINION

GERALDINE SOAT BROWN, MAGISTRATE J.
**\*1** This matter has been referred to this Court by the
District Judge for discovery supervision and ruling on
certain objections and motions to quash or to enforce
certain subpoenas. [Dkt # 135.] As described below,
because many of the objections and motions raised
common issues relating to the scope of discovery, it
was decided that the Court would entertain argument
on issues relating to the scope of discovery first, and
deal subsequently with individual objections by the
recipients of the subpoenas. For the following
reasons, the Court rules, and defers ruling, as to
certain issues relating to the scope of discovery, as
follows.

PROCEDURAL BACKGROUND

In 1996, plaintiff Builders Association of Greater
Chicago ("BAGC"), an association of general
contractors and subcontractors, filed this lawsuit
challenging the constitutionality of the City of
Chicago's Minority-owned and Women-owned
Business Enterprise Procurement Ordinance and the
Program promulgated pursuant to that Ordinance
("M/WBE Program" or "Ordinance"). The Ordinance
requires that each contract let by the City of Chicago
("City") with a value in excess of $10,000 include a
commitment that the contractor will set aside
minimum percentages of subcontract work (*i.e.*, a
percentage of the dollar amounts paid to
subcontractors for the work) for qualified M/WBEs.

The mandatory minimums are 25% for minority-
owned and 5% for women-owned businesses. The
Ordinance also sets aside certain projects exclusively
for M/WBEs. Contractors can seek a waiver of the
set-aside requirements for good faith non-
compliance, though the Ordinance narrowly limits
the circumstances under which a waiver may be
granted. The set-aside program, codified at Chapter
26 of the Municipal Code of Chicago (the "Municipal
Code"), was adopted originally in 1984 and amended
in 1990 by Chapters 2-92-420 through 2-92-580 of
the Municipal Code. (Amended Complaint, ¶¶ 1, 5,
18, 28-31 [Dkt # 27].)

Contemporaneously with its filing of this lawsuit
against the City, the BAGC also filed a parallel
challenge to the constitutionality of construction
contract set-aside requirements established by the
County of Cook, the Illinois county in which the City
is located. *Builders Ass'n of Greater Chicago v.
County of Cook,* 96 C 1121, N.D. Ill. (The present
action is referred herein as *"BAGC v. City"* while the
BAGC's lawsuit challenging the County's ordinance
is referred to herein as *"BAGC v. County."*)

*BAGC v. County*

After denying cross-motions for summary judgment
and hearing a three-week bench trial, Judge John F.
Grady entered judgment on November 2, 2000 in
favor of the plaintiff in *BAGC v. County,* finding that
Cook County's ordinance violated the Equal
Protection Clause of the Fourteenth Amendment to
the United States Constitution. *Builders Ass'n of
Greater Chicago v. County of Cook,* 123 F.Supp.2d
1087 (N.D.Ill.2000). Judge Grady held that Cook
County had failed to introduce persuasive evidence of
a "compelling interest" in its MBE set-aside or an
"important governmental interest" in its WBE set-
aside, or that the County ordinance's set-aside quotas
of 30 per cent and ten per cent respectively for
minority-owned and women-owned subcontractors
were "narrowly tailored" to redress the degree of
discrimination that actually existed against M/WBEs
in Cook County. *Id.* at 1116.The County and certain
intervenors appealed from Judge Grady's judgment to
the Court of Appeals for the Seventh Circuit.
(Appeals No. 00-4161 and 00-4175, consolidated.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.))

The Court of Appeals heard oral argument on May 10, 2001.

*History of discovery in this case.*

**\*2** Although much of the history of discovery in this lawsuit occurred before the referral to this Court, that history is discussed in the briefs submitted by the City and the BAGC. According to those briefs, after the filing of the lawsuit, the City initially sent out ten subpoenas to members of the BAGC, and there followed a period in which information to be used in both *BAGC v. County* and the present action was sought to be obtained by survey. (Def. City of Chicago's Resp. to Third Party Mot. to Quash at 2-5; BAGC's Reply Brief Regarding the City's Subpoenas at 3-5.) The City contends that the information obtained from the BAGC's members in response to the survey was "largely incomplete, meaningless, non-responsive and mathematically inconsistent."(Def. City of Chicago's Resp. to Third Party Mot. to Quash at 4.) The BAGC counters that any insufficiencies in the survey response are the result of flaws in the defendants' design of the survey and the fact that the BAGC's members do not and are not required to maintain business records that would provide information such as the survey sought to obtain. According to the City, there were unsuccessful settlement negotiations, and a tacit agreement to allow *BAGC v. County* to proceed to judgment first before attempting to resolve discovery or otherwise prosecute *BAGC v. City*.(Def. City of Chicago's Resp. to Third Party Mot. to Quash at 5.) In September, 2000, the City states, the BAGC "invited the City to conduct discovery directly [with the BAGC members]."(*Id.* at 7.)

The survey results were converted into interrogatory answers in *BAGC v. County,* and were used as part of the basis of the County expert's opinion at trial. 123 F.Supp.2d at 1095. The BAGC's expert testimony criticized the County expert's conclusions as based on "sparse statistical data." *Id.* at 1109.Judge Grady concluded that the County had not proven that general construction contractors in the six-county area have engaged in a pattern of refusing to hire or consider hiring M/WBE subcontractors because of race, gender or ethnicity. *Id.* at 1116.

The docket record for *BAGC v. County* reflects that the trial in that case, including the BAGC's expert testimony critical of the County's proof, took place in July 2000. Judge Grady's opinion was issued November 2, 2000. In late October and early November, 2000, the City in the present lawsuit served subpoenas with virtually identical Riders requesting 49 categories of documents to: (a) all of the contractors and subcontractors who had been members of the BAGC when the case was filed in 1996; (b) all of the contractor and subcontractor members of the Illinois Road Builders Association; (c) all of the contractor and subcontractor members of the Underground Contractors Association; and (d) all of the contractor and subcontractor members of the Electrical Contractors Association. (Def. City of Chicago's Resp. to Third Party Mot. to Quash at 8-9.) In all, the City has sent out at least 500 subpoenas, and has expressed a need to issue more. (Tr. of April 30, 2001 at 34.)

*The objections and motions regarding the City's subpoenas.*

**\*3** Dozens of objections and motions to quash were filed by various recipients of the subpoenas, including individual contractors and trade associations like the Electrical Contractors Association. (The entities that filed motions to quash or objections are collectively referred to herein as the "Movants and Objectors.") The City also moved to compel responses to the subpoenas. [Dkt # 119.] After discovery supervision was referred to this Court, the City and the BAGC, at the Court's request and with input from the various Movants and Objectors, assembled a status report identifying the various motions and objections that had been filed, and reporting on the status of the objections. (Joint Status Report for Magistrate Judge Geraldine Soat Brown [Dkt # 150].) [FN1] The status report reflects that 44 entities expressed objections or moved to quash. Some, like the Electrical Contractors Association, expressed objections on its own behalf and on behalf of its members. The report also reflected that some of the objections have been resolved between the City and the particular Movant or Objector.

> FN1. The Court appreciates the professionalism and cooperation of all counsel in preparing that status report, which is a very useful assembly of information.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In addition to particular objections relating to particular subpoena recipients, there are certain overriding issues regarding the proper scope of discovery in this case. It was decided that those issues would be addressed first, and that particular objections would be reserved for later individualized treatment. Argument on the overriding issues was held on April 30, 2001 and, again at the Court's request, the BAGC prepared and served, in advance, a List of Issues to be Heard at Oral Argument [Dkt # 157], so that Movants and Objectors could decide whether they wanted to have their counsel appear and argue, or whether they would rely on the BAGC's counsel's argument.

THE ISSUE OF "POST-ENACTMENT"
EVIDENCE AND THE APPROPRIATE SCOPE OF
THE CITY'S SUBPOENAS.

The central, overriding dispute relates to what evidence the City can use to prove its *prima facie* case in support of the Ordinance and, correspondingly, what discovery the City can undertake to assemble that evidence. This dispute over admissibility-and hence discoverability-of evidence arises because of the nature of the BAGC's challenge to the Ordinance. Judge Grady's phrasing of the issue in *BAGC v. County* applies to this case as well:

Normally, of course, the plaintiff in a lawsuit has the burden of proof. But the plaintiff in this case is challenging the constitutionality of a county ordinance which the County has the burden of justifying with "a strong basis in the evidence."*Croson, [City of Richmond v. J.A. Croson Co.]* 488 U.S. 469 at 500, 510, 109 S.Ct. 706, 102 L.Ed.2d 854. The Seventh Circuit has explained the respective burdens of the parties in a case where a plaintiff is challenging a governmental action that is subject to this heightened scrutiny:

Once the governmental entity has shown acceptable proof of a compelling interest in remedying past discrimination and illustrated that its plan is narrowly tailored to achieve this goal, the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional.

*4*Majeske v. City of Chicago,* 218 F.3d 816, 820 (7th Cir.2000) (citations omitted). We understand this to

mean that once the governmental entity has made a *prima facie* showing of the necessary interest, the plaintiff has the burden of overcoming the *prima facie* case by the greater weight of the evidence.

123 F.Supp.2d at 1094. A critical part of the dispute is whether the "acceptable proof" is limited to what information the City Council actually had before it when it adopted the Ordinance or whether the "acceptable proof" can consist of, or at least include, evidence the City can *now* assemble concerning discrimination in the construction industry at the time that it enacted the M/WBE Ordinance.[FN2]This latter evidence is included in the phrase "post-enactment evidence," although what is actually being referred to is evidence of *pre-enactment* conditions, *assembled* post-enactment. The City further argues that because the BAGC also challenges the continuing administration and enforcement of the Ordinance into the present day, the City must also demonstrate that minority and women contractors suffer continuing discrimination. (Def. City of Chicago's Resp. to Third Party Mot. to Quash at 17.) Thus, the City also seeks "post-enactment evidence" in the sense of evidence about conditions after the enactment of the Ordinance. (*Id.*) In addition, assuming, *arguendo,* that some post-enactment evidence is admitted, there are issues about what post-enactment evidence might be relevant. For example, the BAGC argues that union activities and employment discrimination claims against the individual contractors are not admissible and therefore should not be discoverable.

FN2. The City takes the position that it may subpoena information dating back to 1978, five years before the enactment of the W/MBE Ordinance. (Def. City of Chicago's Resp. to Third Party Mot. to Quash at 3, n. 3.)

The issue of the admissibility of post-enactment evidence has confronted courts around the country as they hear challenges to set-aside programs like the Ordinance. *See West Tennessee Chapter of Associated Builders and Contractors, Inc. v. City of Memphis,* 138 F.Supp.2d 1015, 2000 WL 33270372 (W.D.Tenn.2000) (collecting cases, concluding that there are substantial grounds for difference of opinion, and certifying the issue for interlocutory appeal to the Sixth Circuit).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.))

In *BAGC v. County,* the County admitted that it had no evidence of discrimination that had occurred prior to the enactment of the County's Ordinance. 123 F.Supp.2d at 1093. Although Judge Grady stated that he had "some doubt about the matter," in the absence of Seventh Circuit precedent and in view of decisions in several circuits holding that post-enactment evidence could be sufficient to support a race-based or gender-based preference, he denied the BAGC's motion for summary judgment. He allowed the County to attempt to make the necessary showing with post-enactment evidence. 123 F.Supp.2d at 1094. As noted above, the County was unable to do so.

The County and the BAGC have raised and briefed the issue of admissibility of post-enactment evidence to the Seventh Circuit in the appeal of *BAGC v. County.*(BAGC Resp. Brief at 37-40; County Reply Brief at 8-9.) As discussed above, that appeal was argued on May 10, 2001. Because Judge Grady's decision resulted in an injunction against the enforcement of the Ordinance, it is reasonable to expect that the Seventh Circuit will be issuing an opinion imminently. The question before this Court is whether this Court should pronounce a decision on such a critical issue or wait for the Seventh Circuit's soon-expected opinion, which may determine the post-enactment evidence issue, or at least provide guidance. The answer to that question is apparent.

**\*5** For that reason, the Court defers decision on the issue of the appropriate scope of the City's subpoenas until an opinion is issued by the Seventh Circuit in *BAGC v. County.*However, there are a number of issues that can be decided at this time.

### IS THE BAGC COLLATERALLY ESTOPPED FROM OBJECTING TO THE ADMISSION OF POST-ENACTMENT EVIDENCE?

The City contends that the BAGC is precluded under the principle of collateral estoppel from re-litigating the issue of whether post-enactment evidence is admissible (and therefore, by inference, presumably discoverable). (Def.'s Suppl. Br. in Opp'n to Mot. to Quash at 2 [Dkt # 156].) The City also asserts (an argument discussed in the following section) that the non-party Movants and Objectors have no standing to object to the subpoenas on relevancy grounds. (*Id.* at 2, n. 2.) Therefore, the City argues, the issue is

concluded as to whether post-enactment evidence is discoverable.

A party is precluded from relitigating an issue where: 1) the issue sought to be precluded is the same as that involved in the prior action; 2) the issue actually was litigated; 3) the determination of the issue was essential to the final judgment in the prior case; 4) the party against whom estoppel is invoked was represented in the prior action. *Adair v. Sherman,* 230 F.3d 890, 893 (7th Cir.2000). The Seventh Circuit also looks to the *Restatement of Judgments* concerning collateral estoppel requirements. *Chicago Truck Drivers, Helpers and Warehouse Union v. Century Motor Freight,* 125 F.3d 526, 531 (1997). The *Restatement (Second) of Judgments* § 27 states the general rule for issue preclusion:

When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Applying the factors set forth in *Adair, supra,* to *BAGC v. County* and *BAGC v. City,* this Court concludes that the BAGC is not collaterally estopped from challenging whether post-enactment evidence is admissible.

The basis for the City's collateral estoppel argument is its assertion that Judge Grady's ruling in *BAGC v. County* constitutes a holding by the Northern District of Illinois that post-enactment evidence is admissible. (Def.'s Suppl. Br. in Opp'n to Mot. to Quash at 3.) As a preliminary matter, it is important to consider the context in which Judge Grady made the decision to admit post-enactment evidence. As noted above, the issue arose when the BAGC moved for summary judgment after the County admitted that it had no specific evidence of pre-enactment discrimination to support the Ordinance. 123 F.Supp.2d at 1093. Judge Grady's discussion of his decision to deny summary judgment, quoted *supra,* is hardly a "holding" that any and all post-enactment is admissible. Rather, his conclusion was that established precedent was not clear enough to give summary judgment for the BAGC based on a lack of pre-enactment evidence, where the County argued that it would present (post-enactment) evidence demonstrating that "in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

absence of the ordinance, there would be race and gender discrimination by prime contractors in their selection of subcontractors for work on county projects."*Id.* Judge Grady also noted that, in rejecting the plaintiff's pretrial argument against the County's evidence, he "resolve[d] doubts in favor of the defendants and proceeded to trial."*Id.* at 1112.In evaluating the evidence, he "put[ ] aside plaintiff's argument that it is not good enough," and considered what evidence there was to support the Ordinance.*Id.* at 1113.The conclusion, judgment in favor of the BAGC, cannot constitute a precedent that, as a matter of law, post-enactment evidence is admissible.

**\*6** Viewing Judge Grady's ruling in context, the third requirement for issue preclusion, that the determination is essential to the judgment, is not satisfied. The judgment-in favor of the BAGC-would have been the same even if Judge Grady had excluded all post-enactment evidence.[FN3]

> FN3. Illustration 14 to the *Restatement (Second) of Judgments § 27* illustrates this situation:
>
> A, as owner of a trademark, brings an action against B for infringement. B denies the validity of the trademark and denies infringement. The court finds that the trademark is valid, but that B had not infringed it, and gives judgment for B. Thereafter A brings an action against B alleging that since the rendition of the judgment B infringed the trademark. B is not precluded from defending this action on the ground that the trademark is invalid.

As to the first *Adair* requirement, whether *BAGC v. County* and *BAGC v. City* concern identical issues, this is a question of law. *Adair, 230 F.3d at 893.* The court must consider four factors in making this determination: 1) whether there is substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first; 2) whether the new evidence or argument involves application of the same rule of law as that involved in the prior proceeding; 3) whether pretrial preparation and discovery related to the matter presented in the first action reasonably can be expected to embrace the matter sought to be presented in the second

action; 4) whether and to what extent the claims involved in the two proceedings are closely related. *Restatement (Second) of Judgments § 27,* cmt. c.; *Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1116 (9th Cir.1999).*

Applying the *Restatement* analysis, the Court finds the issue in the present case is not *identical* to that considered by Judge Grady in *BAGC v. County* so as to preclude any argument by the BAGC that evidence of the scope that the City seeks here is inadmissible. First, the post-enactment evidence the City would present in the present case could, in theory, be substantially different from the evidence submitted in *BAGC v. County* to support the County ordinance. The two entities have geographically different territories, and are concerned with different public construction projects, and thus, the contracts may attract potentially different general contractors and subcontractors. *See Resolution Trust Corp. v. Keating, 186 F.3d at 1117-18* (no collateral estoppel where the defendant was charged identically with fraud as to various savings and loan institutions, but the evidence relating to each institution was unique to that savings and loan.) Secondly, in *BAGC v. County,* the County introduced anecdotal testimony from fourteen M/WBE owners concerning their claimed experiences of discrimination, testimony from two county officials, adverse testimony from two general contractors and expert testimony including the previously-discussed survey. By contrast in the present case, the City seeks documentary evidence from 500 building contractors concerning essentially every project those contractors have worked on in the period from 1978 to the present, including all documents having to do with inviting subcontractor bids, evaluating and selecting subcontractors, researching qualifications of claimed M/WBEs, and identifying the ultimate receiver of payments to purported M/WBE subcontractors. (Def.'s Resp. to Third Party Mot. to Quash Ex. H, J, L, N [Dkt # 119].) The City has announced its intention to analyze this data in a statistical evaluation of M/WBE utilization both before and after enactment of the Ordinance. (*Id.* at 2, 4, 7-8, 17, 25, 33; Def.'s Opp'n to Mot. of Electrical Contractors Ass'n at 5; Tr. of April 30, 2001 at 35-36, 38-40, 42, 45, 50.)

**\*7** It was only in the aftermath of the insufficient evidence in *BAGC v. County* that the City subpoenaed the documents it now seeks for its

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.))

comprehensive database and statistical analysis. The reactionary aspect of City's discovery attempt demonstrates the subtle but significant difference in deciding the issue of post-enactment evidence in *BAGC v. County* and what is being sought here. There is nothing in *BAGC v. County* to suggest that Judge Grady determined that the defendant could enforce hundreds of subpoenas requiring non-parties to produce their files for the past 22 years to enable defendant's experts to construct complex statistical analyses from a potential mountain of pre-and post-enactment data.

Interestingly, the City responded to the suggestion that collateral estoppel might preclude *it* from relitigating issues determined in *BAGC v. County* by stating, "[I]t would be absurd to believe that there is complete identity between the issues in the County litigation and the current litigation, where the City's Ordinance and the foundation therefore are vastly different than the County's program."(Def. City of Chicago's Resp. to Third Party Mot. to Quash at 36.)

Accordingly, the second factor requiring an *identity* of the issues in the two cases, is not present.

As to the fourth requirement, that the parties to be estopped all were represented in the prior litigation, clearly this cannot apply to the non-party Movants and Objectors. Many of the 500 business entities subpoenaed by the City were not parties in *BAGC v. County* .Hence these parties cannot be estopped from challenging the City's attempt to conduct discovery of post-enactment evidence in the present case.

This is not to say that Judge Grady's decision to admit post-enactment evidence should be disregarded. The Court only concludes that collateral estoppel does not preclude the BAGC or the Movants and Objectors from litigating the issue of whether post-enactment evidence is admissible and therefore discoverable.

### DO THE MOVANTS AND OBJECTORS WHO ARE NOT PARTIES HAVE STANDING TO OBJECT TO THE SUBPOENAS ON THE GROUNDS OF RELEVANCE?

The City argues that the non-party Movants and Objectors have no standing to challenge the relevance of documents sought in the subpoenas, and that such

a challenge can be brought only on their behalf by a party. The City cites *Thomas v. City of Durham,* 1999 WL 203453, *1, n. 1 (M.D.N.C.), and *Shore Acres Nursing Home, Inc. v. Continental Medical Systems, Inc.,* 1991 WL 53664, *3 (E.D.Pa.), to support this contention. (Def. City of Chicago's Reply in Support of its Supp. Br. Regarding Collateral Estoppel at 2-3.) However, neither of those cases directly so holds.[FN4] On the contrary, courts have held that non-parties may raise relevancy objections to subpoenas. *See American Electrical Power Co., Inc. v. U.S.,* 191 F.R.D. 132, 136 (S.D.Ohio 1999) (collecting cases).

> FN4. *Thomas* was an employment discrimination action in which the plaintiff sought personnel files of a number of non-party employees of the defendant. The City objected to production. The passage quoted by the City is part of a footnote in which the court discussed the effort by one of the defendant's employees to maintain the confidentiality of his own personnel file. Significantly, the employee was not the recipient of the subpoena, and although the documents related to his employment, the records were the defendant's.

> In *Shore Acres,* the recipients of the subpoenas were attorneys who asserted protection on privilege grounds, not relevance. The City's brief cites another decision from the Eastern District of Pennsylvania, *Tetratec Corp. v. E.I.Dupont De Nemours & Co., Inc.,* 1992 WL 202169 (E.D.Pa.1992) as "reaching the opposite conclusion without overruling *Shore Acres.*"(Def. City of Chicago's Reply in Support of its Supp. Br. Regarding Collateral Estoppel at 3.) In fact, the court in *Tetratec* never discussed *Shore Acres,* probably because *Shore Acres* does not actually hold that non-party witnesses do not have standing to raise relevancy issues. The comments of the court in *Shore Acres* are, at most, *dicta.*

> *Tetratec,* on the other hand, involved a non-party recipient of a subpoena who raised an objection based on relevance. The court held that such an objection may

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.))**

Page 7

be made, noting, "When ruling on discovery motions, courts have held that non-parties are entitled to greater protection than parties."1992 WL 202169, *1. *See also Hunter v. Heffernan,* No. Civ.A .94-5340, 1996 WL 363842, *1, n. 1 (E.D.Pa.1996): "A non-party resisting a subpoena ducas tecum may challenge the relevance of material sought to the underlying action."

Judge James Moran, the District Judge presiding in this case, has permitted a non-party witness to assert relevancy objections to a subpoena. In *Shields Enterprises, Inc. v. First Chicago Corp.,* 1988 WL 142200, Judge Moran overruled a magistrate judge's decision that a non-party did not have standing to object to the relevance of materials sought in a subpoena where both the plaintiff and the defendant agreed the discovery directed to the non-party was relevant. Judge Moran found persuasive the reasoning of the court in *Fein v. Numex Corp.,* 92 F.R.D. 94, 96 (S.D.N.Y.1981): "[I]t is difficult to imagine a considered evaluation of burdensomeness in the abstract, without balancing the degree of burdensomeness against the extent to which the discovery sought is relevant to the issues in the litigation."1988 WL 142200, *3.

**\*8** In the present case, the BAGC does challenge the relevance of the City's discovery requests, and the City argues that the non-parties' interests already are represented by a party. (Def. City of Chicago's Reply in Support of its Supp. Br. Regarding Collateral Estoppel at 3.) However, the extremely broad scope of the City's Rider to its subpoenas suggests that the Movants and Objectors who wish to argue the relevancy issues should be permitted to do so and not be required to rely on any party to adequately represent them. As indicated above, the City seeks discovery of information covering the period from 1978 to the present. The information it seeks would require contractors to turn over substantially all documents related to every project in that 23-year period, and to furnish additional information on a range of detailed issues relating to subcontractor selection, subcontractor qualifications for the designation of M/WBE, skill and experience evaluations of M/WBE subcontractors compared with non-M/WBE subcontractors, and the responding entity's experience with discrimination claims. A

number of subpoenaed contractors in this case have indicated that the legal fees and other costs entailed in responding to the City's discovery requests would impose a significant economic burden.

Subpoenaed non-parties have the right to challenge the burdensomeness and expense of responding to the subpoena, pursuant to Fed.R.Civ.P. 45(c). The 1991 amendments to Rule 45, which added Subsection (c)(3)(A)(iv), require the court to protect non-parties from "undue burden." The court in *American Power* stated:

Whether a subpoena imposes an "undue burden" upon a witness is a case specific inquiry that turns on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed."

191 F.R.D. at 136, citations omitted. Here, before the Court considers the particular objections to the subpoenas, as a threshold matter the Court must decide whether the City is entitled to conduct *any* discovery of parties or non-parties for the purpose of obtaining post-enactment evidence to support the constitutionality of the Ordinance, and if so, the extent of that discovery.
Obviously, if the sought-after documents are not relevant nor calculated to lead to the discovery of admissible evidence, then *any burden whatsoever* imposed upon Acer [the subpoenaed entity] would be by definition "undue."

*Compaq Computer Corp. v. Packard Bell Electronics, Inc.,* 163 F.R.D. 329, 335-36 (N.D.Cal.1995), emphasis in original.

With so much at stake, the non-parties should be given the opportunity to speak for themselves on this matter. This Court concludes the non-party movants and objectors have standing on their own behalf to challenge the relevance of the materials sought in the subpoenas and are not limited to arguing to the burdensomeness of responding to the subpoena in their particular situations.

CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.))**

Page 8

**\*9** For the foregoing reasons, this Court hereby rules:

1. The Court will defer ruling on the issues of the relevance and proper scope of the City's subpoenas until the Court of Appeals for the Seventh Circuit issues its opinion in *Builders Ass'n of Greater Chicago v. County of Cook;*

2. Plaintiff Builders Association of Greater Chicago and the non-party Movants and Objectors are not estopped from objecting to the admissibility or discovery of so-called "post-enactment" evidence; and

3. The non-party recipients of subpoenas issued by the City in this case have standing to object to the subpoenas on the ground of relevance.

N.D.Ill.,2001.
Builders Ass'n of Greater Chicago v. City of Chicago
Not Reported in F.Supp.2d, 2001 WL 664453 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 4

Westlaw.

Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.), 33 Media L. Rep. 1200
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.))**

**H**Patterson v. Burge
N.D.Ill.,2005.

United States District Court,N.D. Illinois, Eastern
Division.
Aaron PATTERSON, Plaintiff,
v.
Former Chicago Police Lt. Jon BURGE, et al.
Defendants.
**No. 03 C 4433.**

Jan. 6, 2005.

Michael Edward Deutsch, G. Flint Taylor, Jr., Joey
L. Mogul, People's Law Office, Standish E. Willis,
Law Office of Standish E. Willis, Chicago, IL,
Demitrus Evans, Evanston, IL, for Plaintiff.
Richard Thomas Sikes, Jr., Oran Fresno Whiting,
Terrence J. Sheahan, Richard Bruce Levy, Freeborn
& Peters, Patrick T. Driscoll, Jr., Patrick T. Driscoll,
Jr. P.C., Cook County State's Attorney, Louis R.
Hegeman, Cook County State's Attorney's Office,
John Patrick Goggin, Steven M. Puiszis, Robert
Thomas Shannon, Corinne D Cantwell, Hinshaw &
Culbertson, Chicago, IL, for Defendants.

*Memorandum Opinion and Order*

GOTTSCHALL, J.
*1 On August 5, 2004, plaintiff Aaron Patterson was
arrested on federal drug and weapons charges.
Patterson's arrest and comments about it he made in
interviews with a number of journalists have been
highly publicized. On October 18, 2004, defendants
in this lawsuit served subpoenas on various news
organizations, specifically, the Chicago Tribune
Company, WGN Continental Broadcasting Company
and WMAQ-TV ("the news organizations") seeking
all videotape and audiotape footage, including
outtakes, and any and all documents, including notes
and transcripts, reflecting statements made by
Patterson between August 6, 2004 and August 19,
2004.[FN1] The three news organizations have moved to
quash the subpoenas, arguing that the subpoenas
violate the Illinois Reporter's Privilege Act, the First
Amendment to the United States Constitution and the
Illinois Constitution, and further require quashing or

modification under Rule 45(c). In their Response to
the Motion to Quash, the defendants have withdrawn
their request for notes, having learned that there are
sufficient video and audiotapes to render any
interview notes cumulative. In addition, the court is
under the impression that the news organizations
have already made available to the defendants all
broadcast footage and published interviews. If that is
not the case, such materials should immediately be
turned over since none of the arguments advanced by
the subpoena respondents justify the withholding of
any previously-published materials.[FN2]

> FN1. This description generalizes the
> requests, although there were minor
> differences in the requests to each of the
> news organizations.

> FN2. If the parties cannot negotiate an
> agreement covering the costs of any such
> materials, they can seek the assistance of the
> court.

In *McKevitt v. Pallasch,* 339 F.3d 530 (7th Cir.2003),
the Seventh Circuit stated that it could find no basis,
in law or fact, for recognizing a reporter's privilege
under federal or state law cognizable in federal
proceedings. Rather, it stated that instead of invoking
a privilege, "courts should simply make sure that a
subpoena duces tecum directed to the media, like any
other subpoena duces tecum, is reasonable in the
circumstances." This court will therefore pretermit
consideration of the news organizations' statutory and
constitutional arguments and analyze the motion to
quash under the standards of Rule 45(c).

The Seventh Circuit has recently dealt with Rule
45(c) standards in *Northwestern Memorial Hospital
v. Ashcroft,* 362 F.3d 923 (7th Cir.2004). Recognizing
that "pretrial discovery is a fishing expedition and
one can't know what one has caught until one fishes,"
the court noted that when the fish objects under Rule
45(c), the fisherman is called upon to justify his
pursuit. 362 F.3d at 931. In this circumstance, the
court must engage in a balancing process, balancing
the burden of compliance against the benefits of the
requested production. *Id.* at 927.Put in a fish-free
way, non-parties are not treated exactly like parties in

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.), 33 Media L. Rep. 1200
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.))**

the discovery context, and the possibility of mere relevance may not be enough; rather, non-parties are entitled to somewhat greater protection. *See Builders Ass'n of Greater Chicago v. City of Chicago,* 2001 WL 664453 at *7 n. 4 (N.D.Ill. June 12, 2001). That protection encompasses weighing the need for the material subpoenaed against the burden involved in its production. Burden in this context means more than mere administrative hardship. It encompasses the interests that enforced production would compromise or injure. *Northwestern Hospital, supra,* at 928-29.

**\*2** The justifications defendants have advanced for these subpoenas are meager, to say the least, and consist largely of arguing repeatedly, albeit in different verbal formulations, that the materials sought may contain relevant information. The defendants assert that the complaint alleges a continuing conspiracy to injure Patterson emotionally, and point out that in his statements to reporters, as well as in statements at his preliminary hearing, Patterson at times claimed that his 2004 arrest was part of that conspiracy. Defendants assert, "If plaintiff has made non-privileged statements about this alleged conspiracy, surely defendants are entitled to production of these statements so they can discover the basis for the claim."Response at 5. Defendants, however, suggest no basis for believing that there are statements other than those they already have and never explain why, if they are curious about the basis for this claim, they have not served a contention interrogatory asking for it. Further, defendants argue that because plaintiff may be claiming that the arrest was part of the conspiracy alleged in his complaint, "it is crucial that defendants be permitted access to statements made by Patterson to test his claims of conspiracy in this case."*Id.* This is obviously the same justification set forth above but stated in more urgent terms. Finally, defendants summarize their argument: "Given that the lawsuit contains a claim for an ongoing conspiracy to inflict emotional distress, Patterson's statements to the Journalists are absolutely relevant to this case."*Id.* The essence of this perseverative argument, as far as the court understands it, is that because Patterson has stated that his arrest relates to the allegations of his complaint, anything he may have said about his arrest is relevant to his civil case.

The remainder of defendants' argument appears to

invoke other bases for discovery, but really does nothing more than flesh out their relevance argument: "Patterson's statements are relevant for a host of other reasons as well. Among other things, they may be used for impeachment; or fodder for cross-examination;[FN3] or lead to other admissible evidence; or possibly deemed an admission under Fed. Rule.Evid. 801(d)(2)." If possible relevance were the standard for enforcing the subpoenas, defendants would surely prevail. No one is arguing that the interview records do not contain relevant statements by Patterson. Moreover, it is possible that Patterson said something during those interviews that could be used to cross-examine him in the civil suit or be used as an admission. Defendants are simply speculating, however, that the news organizations' non-published materials contain impeachment information or admissions. Defendants have apparently served these subpoenas before questioning Patterson, by deposition or interrogatories, about his statements to the news organizations or his conspiracy theory. Thus, defendants can establish relevance in its broadest and weakest sense. They cannot establish that their subpoenas seek information they do not already have or that is not readily available from other sources. Of course, the fact that what the defendants seek is Patterson's own statements adds something to the "mere relevance" of their requests.

> FN3. Again, defendants assert little more than different verbal formulations for the same claim. There is not much difference between evidence useful for impeachment, fodder for cross-examination and admissions of a party opponent.

**\*3** Against these weak justifications, the burden on respondents is significant. Granted, simply turning over the tapes from which their published materials were drawn does not represent a major administrative burden. But requiring such production would establish that simply on the basis of a showing of relevance (and merely *possible* usefulness, since there is no reason to believe that Patterson told the reporters anything in private that he has not said publicly), private parties in a civil suit can call on the press to turn over the fruits of its investigative efforts. Since the press is involved in collecting information about all manner of things and circumstances that frequently end up in litigation, if there is no standard higher than mere relevance which civil lawyers must

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.), 33 Media L. Rep. 1200
(Cite as: Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.))

satisfy to help themselves to reporters' records, news organizations will be very busy responding to civil subpoenas. Similarly, the news organizations' efforts to maintain their independence and gain the trust of sources is an interest that will be severely impaired if mere relevance, meaning as it does here a mere relationship to the subject matter of a civil suit, makes their non-public records available on request. Further, the journalistic and editorial judgments involved in deciding what to ask an interview subject, and in deciding what to use from the material gathered, are the commercial and intellectual stock in trade of the news organizations; surely some good justification should be advanced before these journalistic and editorial judgments can be examined by outsiders and made public in the context of a civil lawsuit. As Judge Brown stated in her September 16, 2004 ruling on the Chicago Reader's Motion to Quash Subpoena in *Hobley v. Burge,* No. 03 C 3678, Rule 45(c) explicitly permits the court to protect against the disclosure of trade secrets and other confidential commercial information, and "[t]here is nothing in the Federal Rules that suggests that research for the purpose of news reporting [not to speak of editorial judgments about what should and should not be published] is to be given *less* protection than research for the purpose of product development."(Order, p. 13.)

In this case, where the subject matter of the civil suit raises issues of immense public importance, the press' efforts to shed light on the non-public recesses of certain police station activities has value to the entire City. To the extent the news organizations' resources are squandered providing information to civil litigants; or their ability to create sources hampered by judicial insensitivity to the value of their attempts to protect the confidentiality of the information they receive; or their motivation to develop their information and use it as they see fit; or the commercial value to the involved news organizations of the judgments involved in investigating and selecting material for publication dissipated as their "work product" becomes fair game for civil litigants in their relentless quest to "discover" everything, the news organizations become the indentured servant of the litigants, and their ability to do their important work will be severely impaired. The kind of discovery requested here not only burdens the news organizations but burdens the public interest in a robust press.

*4 In *McKevitt v. Pallasch,* 339 F.3d 530 (7th Cir.2003), the court affirmed an order of the district court requiring news organizations to produce to plaintiff McKevitt tape recordings of an interview conducted with David Rupert by journalists who were writing Rupert's biography. McKevitt was being prosecuted in Ireland for terrorism-related activities and wanted the tape recordings to assist him in cross-examining Rupert, who was expected to be a key prosecution witness. The Seventh Circuit found that there was no interest in confidentiality being compromised, inasmuch as the source, Rupert, was known and had indicated that he did not object to disclosure. In the case at bar, similarly, the interest in confidentiality is weak, since the source, Patterson, is known. Further, his objection to disclosure is entitled to little weight if any weight at all inasmuch as he is the plaintiff in this case and has no cognizable interest in the privacy of things he says to third parties that bear, even tangentially, on the litigation. But the Seventh Circuit in *McKevitt* also cited the important public obligation to assist in criminal proceedings and the federal interest in cooperating in the criminal proceedings of friendly foreign nations as factors favoring disclosure. Neither of those interests is operative in the present context.

In requiring the Reader to turn over Hobley's letters but not its reporter Conroy's notes of his interview with Hobley, Judge Brown observed that Hobley's letters were analogous to the tape recordings ordered disclosed in *McKevitt.*This court agrees with Judge Brown that tape recordings and letters have in common that the administrative burden involved in producing them is very limited. Beyond that, however, the court disagrees with any implication in Judge Brown's decision, which did not involve audio or video recordings, that such recordings of a non-public interview by a journalist are otherwise analogous to the letters ordered disclosed in *Hobley.*In many respects, such recordings are much more like the reporter's notes as to which Judge Brown quashed the *Hobley* subpoena. They reflect the journalist's thought processes, his or her method of investigation, and his or her choices about what should be published and what withheld. As Judge Brown observed regarding the reporter's notes in *Hobley,*"The only value of the notes to the Individual Defendants is the possibility that they *might* reflect something that Hobley said to Conroy that *might* be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.), 33 Media L. Rep. 1200
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.))**

helpful to the Defendants."Order of September 16 at 12. Moreover, Judge Brown observed, the notes are the reporter's confidential work product, as is the case with the recorded interviews sought here. *Id.* at 13.Granted, compelled disclosure of reporters' notes is more invasive than the production of recordings since, as Judge Brown observed, the reporter involved would almost certainly have to be deposed to interpret the notes before any use could be made of them. But this court is of the view that recordings of interviews are in almost all important ways much more like interview notes than like unsolicited letters, and Judge Brown's analysis, applied here, counsels strongly against compelling disclosure.

**\*5** Given the weak showing of materiality made by defendants, the lack of any compelling public interest in disclosure such as was present in *McKevitt* and the significant burden on important private and public interests compelled production in this case would involve, this court, pursuant to the balancing of interests required by Rule 45(c), grants the news organizations' Motion to Quash.

N.D.Ill.,2005.
Patterson v. Burge
Not Reported in F.Supp.2d, 2005 WL 43240 (N.D.Ill.), 33 Media L. Rep. 1200

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.